| | |
|---|---|
| National Association of<br>  Mortgage Brokers,<br><br>              Plaintiff,<br><br>              v.<br><br>Board of Governors of<br>  the Federal Reserve System, *et al.*,<br><br>              Defendants. | Civil Action No. 1:11-cv-00506 (BAH)<br>Judge Beryl A. Howell |
| National Association of Independent<br>  Housing Professionals, Inc.,<br><br><br>              Plaintiff,<br><br>              v.<br><br>Board of Governors of<br>  the Federal Reserve System,<br><br>              Defendant. | Civil Action No. 1:11-cv-0489 (BAH)<br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Over the past few years, this country has grappled with an extended economic crisis, the roots of which have been attributed to failures in the home mortgage industry.  In an effort to understand and correct failures in this market, Congress and the regulatory agencies overseeing the home mortgage industry held hearings, conducted studies, and ultimately proposed laws and regulations prohibiting industry practices deemed to be deceptive or unfair.  In the case currently before the Court, two national trade organizations representing mortgage brokers and other independent housing professionals challenge the Federal Reserve Board's authority and reasoning in promulgating certain prohibitions.  The National Association of Independent

Housing Professionals, Inc. (hereinafter "NAIHP") and the National Association of Mortgage

Brokers (hereinafter "NAMB") have requested the Court to issue a temporary restraining order

and preliminary injunction to enjoin the Board of Governors of the Federal Reserve System

(hereinafter "the Board")[1] from implementing a Final Rule, effective on April 1, 2011, that

restricts certain compensation practices of loan originators relating to mortgage loans

(hereinafter "the Rule"), 12 C.F.R. § 226.36(a), (d), (e); Federal Reserve System Final Rule

Amending Regulation Z, 75 Fed. Reg. 58,533 (Sept. 24, 2010) (to be codified at 12 C.F.R. pt.

226).  NAIHP Appl. TRO and Mot. Prelim. Inj., No. 11-cv-489, Mar. 7, 2011, ECF No. 3;

NAMB Mot. TRO and Mot. Prelim. Inj., No. 11-cv-506, Mar. 9, 2011, ECF Nos. 3, 4.  The

plaintiffs allege that in promulgating this Rule, the Board exceeded its authority under the Truth

in Lending Act ("TILA") and the Home Ownership and Equity Protection Act ("HOEPA"), and,

if the Board did have authority to issue the Rule, the plaintiffs allege that the Rule is arbitrary

and capricious.  NAIHP Mem. Supp. Mot. Prelim. Inj., ECF No. 3 (hereinafter "NAIHP Mem."),

at 14-19; NAMB Mem. Supp. Mot. Prelim. Inj., ECF No. 4 (hereinafter "NAMB Mem."), at 24-

39; *see also* 5 U.S.C. § 706(2).

After reviewing NAIHP and NAMB's motions for injunctive relief, the defendants'

opposition papers, amicus briefs,[2] as well as the record currently before the Court,[3] accompanying

---

[1] NAMB also named in its Complaint the Board's Chairman, Ben Bernanke, and the Board's Director of the Division of Consumer and Community Affairs, Sandra Braunstein.

[2] On March 24, 2011, the Court granted the Center for Responsible Lending and the National Consumer Law Center's request for leave to file a joint amicus brief in support of the defendants. Minute Order, No. 11-cv-506, Mar. 24, 2011. On March 25, 2011, the Court granted the Community Mortgage Banking Project and Community Mortgage Banking Research Fund's request for leave to file a joint amicus brief in support of the plaintiffs.  Minute Order, No. 11-cv-489, Mar. 25, 2011.

[3] At the time of this decision, the Court has yet to receive the full administrative record associated with the challenged Rule.  Under Local Rule 65.1(d), the Court is urged to resolve motions seeking injunctive relief within 21 days from the date of filing, which is particularly important here since the parties seek to enjoin implementation of an agency rule that is effective April 1, 2011.  The current record before the Court, however, includes the Board's notice of proposed rulemaking, Federal Reserve System Proposed Rule, 74 Fed. Reg. 43,232 (proposed August 26,

declarations[4] and applicable law, and following oral argument, the Court denies NAIHP and NAMB's motions for a temporary restraining order and preliminary injunction.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

The plaintiffs claim that the Board's Rule exceeds its authority and is arbitrary and capricious. A general description of the industry and practices that prompted the Board's concern to promulgate the Rule provides a valuable context in evaluating these challenges.

### A.  The Work of Mortgage Loan Originators and Mortgage Brokers

Mortgage brokers are independent financial professionals who work with consumers and lenders to obtain mortgage loans. NAIHP Mot. Prelim. Inj., ECF No. 3, Ex. 1, Marc S. Savitt Aff. (hereinafter "Savitt Aff."), ¶ 3. Mortgage brokers are typically small businesses, employing individual brokers and loan officers who "work with consumers to help them with the

---

2009) (to be codified at 12 C.F.R. pt. 226), as well as the Board's notice of the final rule, Federal Reserve System Final Rule Amending Regulation Z, 75 Fed. Reg. 58,509 (Sept. 24, 2010) (to be codified at 12 C.F.R. pt. 226). *Cf. Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (remand of district court's denial of preliminary injunction relief because "rather than calling for the administrative record, the district court appears to have relied on the parties' written or oral representations to discern the basis on which the FDA acted. Surely that was not sufficient. For all we know, the attorneys were merely speculating."); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419 (1971) (remanding to district court when "there is an administrative record that allows the full, prompt review of the Secretary's action that is sought without additional delay which would result from having a remand to the Secretary.").

[4] The plaintiffs submitted a total of thirteen affidavits: NAIHP submitted five affidavits, including affidavits from NAIHP's President, two industry analysts, a survey research consultant, and a former employee of a company specializing in software for mortgage brokers. NAIHP Mot. Prelim. Inj., No. 11-cv-489, ECF No. 3, Ex. 1, Marc S. Savitt Aff. (President of NAIHP); NAIHP Reply Defs.' Opp. Pls.' Mot. Prelim. Inj., No. 11-cv-489, ECF No. 22, Exs. 1-4, Paul Muolo Aff. (employee of SourceMedia, which publishes quarterly rankings of residential originators); William F. Kidwell, Jr. Aff. (President of Impact Mortgage Management Advocacy and Advisory Group ("IMMAAG")); Sarah Butler Aff. (Senior Consultant at NERA Economic Consulting); Rick Roque Aff. (former employee of Calyx Software, a mortgage originator software company). NAMB submitted eight affidavits, three from NAMB Board Members, and five from individuals running mortgage brokerage firms across the country. NAMB Mot. Prelim. Inj., No. 11-cv-506, ECF No. 4, Exs. 4-10, Michael D'Alonzo Aff. (President of the NAMB); Michael Anderson Aff. (NAMB Board Member and Chair of the NAMB Governmental Affairs Committee); Terry Clark Aff. (CEO of Platinum Mortgage in Madison, Alabama); Carlos Gutierrez Aff. (owner and President of CNC Mortgage, LLC in Minnetonka, Minnesota); Belinda M. Janecke Aff. (owner and managing partner of Pinnacle Mortgage Group, LLC in Mandeville, Louisiana); Residential Mortgage of South Carolina, LLC Aff. (affiant Kevin M. Breeland, General Manager of Residential Mortgage of South Carolina, LLC in Mt. Pleasant, South Carolina); Walter Financial, Inc. Aff. (affiant Richard F. Walter, President of Walter Financial, Inc. in Doylestown, Pennsylvania); NAMB Reply Defs.' Opp. Pls.' Mot. Prelim. Inj., No. 11-cv-506, ECF No. 25, Ex. 1, Michael Anderson Supplemental Aff..

complexities of home purchases by taking the applications; performing financial and credit evaluations; collecting and preparing documents; working with realtors; ordering title searches, appraisals, and pay-off letters; assisting in remedying faulty credit reports or title problems; and facilitating loan closings." *Id.;* see *also* NAMB Mot. Prelim. Inj., ECF No. 3, Michael J. D'Alonzo Aff. (hereinafter "D'Alonzo Aff."), ¶ 9.

For many consumers, an obstacle to getting a home loan is the upfront cost of obtaining a mortgage. Mortgage brokers have thus created mechanisms to defer such costs. One method of deferring upfront cost is by utilizing a "yield spread premium" ("YSP"). A YSP is the present dollar value of the difference between the lowest interest rate a lender would have accepted for a particular transaction and the interest rate the consumer ultimately agreed to pay to the lender. *See* Federal Reserve System Final Rule Amending Regulation Z, 75 Fed. Reg. 58,511 (Sept. 24, 2010) (to be codified at 12 C.F.R. pt. 226) (hereinafter "Board Notice of Final Rule"); *see also* Savitt Aff., ¶ 4; NAIHP Mem., at 6; D'Alonzo Aff., ¶ 17. YSPs can be used to reduce the consumer's upfront closing costs, compensate loan originators for their services, or both. Board Notice of Final Rule, 75 Fed. Reg. 58,511; *see also* Savitt Aff., ¶¶ 4, 6.

Mortgage brokers may receive compensation for their services through YSPs, the loan proceeds, or from the consumer's preexisting resources. Board Notice of Final Rule, 75 Fed. Reg. 58,511; D'Alonzo Aff., ¶¶ 14-15. This compensation is provided either by the consumer, in "Consumer Pay Transactions," by the lender in "Lender Pay Transactions," or both. D'Alonzo Aff., ¶¶ 14-16. Most loan officers who work for mortgage brokers are compensated by their employers on a commission basis. *Id.* at ¶¶ 18-19. The commission-based compensation model for loan officers has been used in the industry for "decades, and it works well." *Id.* at ¶ 19. The commission-based system is also pervasive because "many mortgage brokers are small

4

businesses [and] [t]hese businesses often lack the capital reserves or transaction volume to justify paying loan officers on a salaried basis." *Id.*

In recent years, the mortgage industry has transformed considerably. Savitt Aff., ¶¶ 5, 8. Previously, mortgage brokers would facilitate a consumer's purchase of a loan, with the loan ultimately residing with a specific lender. Today, lenders themselves often re-package, sell, and securitize loans for the secondary market. *Id.* Thus, "originators who in the past may have been distinguishable from mortgage brokers increasingly function as brokers." NAIHP Mem., at 7; *see also* Savitt Aff., at ¶ 5 ("Mortgage markets have evolved in recent years and consequently mortgage professionals and entities may work in multiple capacities. Lenders often know at the time of closing that they will promptly sell the loan and they know how much they will make from that sale.").

### B. Regulation of Mortgage Brokers

Since 1996, mortgage brokers and non-bank loan originators (independent loan originators) have been required to disclose to consumers the details of their compensation and their relationship with creditors. Savitt Aff., ¶ 7. Standard disclosure forms inform consumers that the loan originator is "acting as an independent contractor and not as [the consumer's] agent." Savitt Aff., Ex. A, Mortgage Loan Origination Agreement. The disclosure forms further indicate that the loan originator "cannot guarantee the lowest price or best terms available in the market." *Id.* These disclosure statements also provide details regarding the mortgage broker's potential compensation, stating, *inter alia*, that "the retail price we offer you – your interest rate, total points and fees – will include our compensation. . . . In some cases, we may be paid all of our compensation by either you or the lender. . . . Alternatively, we may be paid a portion of our compensation by either you and the lender." *Id.*

**C.      History and Promulgation of Board's Rule on Loan Originator Compensation**

Since 2006, the Board has examined loan originator compensation and its effect on consumers. Over the course of four Board hearings, an advanced notice of proposed rule-making, two proposed rule-makings, and various studies, the Board reviewed options for protecting consumers from perceived unfair practices, and ultimately determined that the prohibitions reflected in the Rule would best protect consumers. *See* Federal Reserve System Notice of Public Hearing on the Home Equity Lending Market, 72 Fed. Reg. 30,380 (May 31, 2007); Federal Reserve System Notice of Public Hearing on the Home Equity Lending Market, 71 Fed. Reg. 26,513 (May 5, 2006); Federal Reserve System Proposed Rule Amending Regulation Z, 73 Fed. Reg. 1,673 (proposed Jan. 9, 2008) (to be codified at 12 C.F.R. pt. 226); Federal Reserve System Final Rule, 73 Fed. Reg. 44,522 (July 30, 2008) (to be codified at 12 C.F.R. pt. 226); Federal Reserve System Proposed Rule, 74 Fed. Reg. 43,232 (proposed August 26, 2009) (to be codified at 12 C.F.R. pt. 226) (hereinafter "Board Notice of Proposed Rule"); Federal Reserve System Final Rule Amending Regulation Z, 75 Fed. Reg. 58,509 (Sept. 24, 2010) (to be codified at 12 C.F.R. pt. 226); NAIHP Mot. Prelim. Inj., Ex. 2, Macro International, Summary of the Findings: Consumer Testing of Mortgage Disclosures (hereinafter "Macro Study") (July 10, 2008); Board Notice of Final Rule, 75 Fed. Reg. 58,511 n.4 (referencing Kellie K. Kim-Sung & Sharon Hermanson, Experiences of Older Refinance Mortgage Loan Borrowers: Broker- and Lender-Originated Loans, Data Digest No. 83, 3 (AARP Public Policy Inst., Jan. 2003), *available at* http://assets.aarp.org/rgcenter/post-import/dd83_loans.pdf.). The Board held hearings regarding loan originator compensation in 2006 and 2007, and in December 2007 proposed a rule that would "prohibit creditors from paying a mortgage broker more than the consumer had agreed in advance that the broker would receive." Federal Reserve System

Proposed Rule Amending Regulation Z, 73 Fed. Reg. 1,672, 1,673 (proposed Jan. 9, 2008). The proposed rule would also have required the written agreement between the consumer and broker to contain disclosures which the Board subsequently subjected to consumer testing.[5]

On July 30, 2008, the Board published a notice of a final rule that was intended to implement new consumer-protection regulations for mortgage lending and servicing. When proposing these rules, the Board withdrew its previous proposal to "prohibit creditors from paying a mortgage broker more than the consumer had agreed in advance that the broker would receive" and the associated model disclosures because it concluded that additional testing was needed on the issue. Federal Reserve System Final Rule, 73 Fed. Reg. 44,522, 44,523 (July 30, 2008) (to be codified at 12 C.F.R. pt. 226). Specifically, the Board found that the proposed disclosures did not reduce consumer confusion, but rather "presented a significant risk of misleading consumers regarding both the relative costs of brokers and lenders, and the role of brokers in their transactions." Board Notice of Final Rule, 75 Fed. Reg. 58,511. The Board indicated its intent to explore other options to address potential unfairness associated with loan originator compensation arrangements, such as Yield Spread Premiums. *Id.*; *see also* Federal Reserve System Final Rule, 73 Fed. Reg. 44,563 (July 30, 2008).

On August 26, 2009, the Board published another notice of proposed rulemaking in which it again proposed to add and amend several sections of Regulation Z, the Board's

---

[5] In order to gauge the effectiveness of the model language for mortgage broker disclosure statements, the Board contracted with Macro International to conduct "a series of cognitive in-depth interviews with consumers" to evaluate "how clearly the model language communicated the intended content, and to help the Board make any necessary revisions to make the language more effective." Macro Study, at 1. This testing revealed significant consumer confusion regarding mortgage brokers' compensation and mortgage brokers' relationship with other actors in the mortgage loan industry. *Id.* at ii. For example, "despite repeated attempts to address [consumer confusion] through revisions of the [supplied broker's] agreement" most participants "did not understand how lender payments to brokers created a financial incentive for brokers to provide loans with higher interest rates. . . . [T]his fact was extremely counter-intuitive to participants – many of whom had previously assumed that a broker would work in their best interest." *Id.* As a result of this confusion, "a significant number [of participants] either did not believe or ignored the conflict of interest described in the agreement." *Id.* at 26. A "key reason" for this confusion was that these consumers "did not realize that brokers have influence over the [interest] rates they offer their customers." *Id.* at ii.

regulations implementing the Truth In Lending Act ("TILA"). Board Notice of Proposed Rule, 74 Fed. Reg. 43,232. Pursuant to its authority under TILA Section 129(l)(2), (codified at 15 U.S.C. §1639(l)(2)), to prohibit unfair and deceptive practices "in connection with" mortgage loans and mortgage refinancing, the Board sought to prohibit certain forms of mortgage broker compensation. *Id.* at 43,282-86. On September 24, 2010, the Board issued its Final Rule, which retained only those provisions from its 2009 notice of proposed rulemaking that prohibited "unfair" loan originator compensation practices. Board Notice of Final Rule, 75 Fed. Reg. 58,509. Specifically, the Rule prohibits (1) basing loan originator compensation on a loan's terms or conditions, other than loan amount, (2) compensating a loan originator from both the consumer and any third party for the same transaction (the "anti-split compensation provision"); and (3) a loan originator from steering a consumer to a particular loan in order to receive greater compensation (the "anti-steering provision").[6] *Id.*

---

[6] The Final Rule states in pertinent part:

> (d) Prohibited payments to loan originators.
>> (1) Payments based on transaction terms or conditions.
>>> (i) In connection with a consumer credit transaction secured by a dwelling, no loan originator shall receive and no person shall pay to a loan originator, directly or indirectly, compensation in an amount that is based on any of the transaction's terms or conditions.
>>> . . .
>> (2) Payments by persons other than consumer. If any loan originator receives compensation directly from a consumer in a consumer credit transaction secured by a dwelling:
>>> (i) No loan originator shall receive compensation, directly or indirectly, from any person other than the consumer in connection with the transaction; and
>>>
>>> (ii) No person who knows or has reason to know of the consumer-paid compensation to the loan originator (other than the consumer) shall pay any compensation to a loan originator, directly or indirectly, in connection with the transaction.
>> . . .
> (e) Prohibition on steering. (1) General. In connection with a consumer credit transaction secured by a dwelling, a loan originator shall not direct or "steer" a consumer to consummate a transaction based on the fact that the originator will receive greater compensation from the creditor in that transaction than in other transactions the originator offered or could have offered to the consumer, unless the consummated transaction is in the consumer's interest.

*Id.* at 58,534.

In issuing this rule, the Board stated that its purpose "is to protect consumers in the mortgage market from unfair or abusive lending practices that can arise from certain loan originator compensation practices, while preserving responsible lending and sustainable homeownership." *Id.* at 58,509. These three new prohibitions are intended to eliminate incentives for mortgage brokers to offer consumers loans with less favorable terms. *Id.* at 58,514-15. The Final Rule becomes effective on April 1, 2011. *Id.* at 58,530.

### D. NAIHP AND NAMB LAWSUITS

On March 7, 2011, twenty-five days before the Rule's effective date, NAIHP filed a Complaint challenging the Board's authority and reasonableness in prohibiting the loan originator compensation practices set forth in 12 C.F.R. § 226.36(d) and (e). Plaintiff NAIHP is a trade corporation that represents independent housing professionals, including loan originators, across the country. Savitt Aff., ¶ 1. NAIHP's specifically challenges the prohibition on (1) basing loan originator compensation on a loan's terms or conditions, other than the loan amount; (2) loan originator compensation from both the consumer and any third party for the same transaction; and (3) a loan originator from steering a consumer to a particular loan in order to receive greater compensation. NAIHP moved for a temporary restraining order and a preliminary injunction to enjoin the Board from implementing the Rule. No. 11-cv-489, ECF No. 3. At the Court's request, the parties filed a Joint Stipulation agreeing to a prompt briefing schedule, which the Court ordered. Minute Order, No. 11-cv-489, March 10, 2011.

Two days after NAIHP filed its Complaint, on March 9, 2011, NAMB filed its own challenge of the Board's Rule, but contested only the Board's authority and reasonableness in promulgating § 226.36(d)(2), the provision prohibiting loan originators from receiving other compensation when they are compensated by a consumer. NAMB Compl., ¶ 1. NAMB is also a

national trade organization, but represents only the interests of the mortgage broker industry. D'Alonzo Aff., ¶ 4. Like NAIHP, NAMB immediately requested a temporary restraining order and preliminary injunction. No. 11-cv-506, ECF Nos. 3, 4. NAMB also moved for expedited discovery, seeking the Board's production of the entire administrative record and "any documents (electronic or hard copy) relating to the Rule's restrictions on loan originator compensation." NAMB Mem. Supp. Mot. Expedited Disc., No. 11-cv-506, ECF No. 5, at 3.

On March 10, 2011, the Board filed a notice of related case and a motion to consolidate NAIHP and NAMB's suits on the basis that both plaintiffs were challenging the same Rule on the same bases, namely, that the Board violated the Administrative Procedure Act by promulgating the Rule without statutory authority and, in any event, acted arbitrarily and capriciously. Board's Mot. to Consolidate the Civil Actions, Nos. 11-cv-489, 11-cv-506, March 10, 2011, ECF No. 10, at 3. The Court granted defendants' motion, consolidated the cases, and ordered all parties to abide by the expedited briefing schedule previously ordered to resolve the motions for injunctive relief. Minute Order, Nos. 11-cv-489, 11-cv-506, dated March 11, 2011.

Following consolidation of the cases, NAMB requested the Court to reconsider consolidation, arguing that NAMB's challenge is narrower in scope as it "is only seeking to challenge a small sub-section of the Board's final rule" and that abiding by the briefing schedule set forth in the NAIHP matter would cause "NAMB's members significant and irreparable harm and prejudice." NAMB Mem. Supp. of Mot. Expedited Recons., March 14, 2011, ECF No. 11, at 2. The Court denied NAMB's motion, explaining that NAIHP and NAMB's legal challenge involved the same questions of law and fact, and that consolidation of the cases will expedite, rather than delay, judicial review. Memorandum Opinion and Order, Nos. 11-cv-489, 11-cv-506, Mar. 21, 2011. In its opinion declining to reconsider consolidation of the cases, the Court also

addressed NAMB's Motion for Expedited Discovery, granting in part and denying in part the latter motion. Specifically, the Court ordered the defendants to expeditiously produce the administrative record, but denied the NAMB's request for "any documents (electronic or hard copy) relating to the Rule's restrictions on loan originator compensation." *Id.*; NAMB Mem. Supp. of Mot. Expedited Recons., ECF No. 11, at 3.

The Court now considers both NAIHP and NAMB's motions for injunctive relief from the Board's Rule prohibiting certain loan originator compensation practices.

## II.     PLAINTIFFS' MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The court may issue a temporary restraining order ("TRO") when a movant is faced with the possibility that irreparable injury will occur even before the hearing for a preliminary injunction required by Federal Rule of Civil Procedure 65(a) can be held. FED. R. CIV. P. 65(b)(1). The purpose of a TRO is to maintain the status quo of a case until the court has an opportunity to hear a request for fuller relief. *Id.; see, e.g., Hosp. Res. Pers., Inc. v. United States*, 860 F. Supp. 1554, 1556 (S.D. Ga. 1994) (explaining that the purpose of a TRO is to preserve the status quo pending a hearing for a preliminary or permanent injunction). The factors that apply in evaluating requests for a temporary restraining order are identical to those that apply in evaluating requests for preliminary injunctions. *See Al-Fayed v. C.I.A.*, 254 F.3d 300, 303 n.2, (D.C. Cir. 2001); *Sobin v. Bechtol*, 168 Fed. Appx. 452, 452 (D.C. Cir. 2005) (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 57 (D.C. Cir. 1977)); *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 8 (D.D.C. 2009); *Morgan Stanley DW, Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001).    In this case, the Court considers the motions for both the TRO and preliminary injunction together.

### A.  STANDARD OF REVIEW

To warrant injunctive relief, the plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 129 S.Ct. 365, 374 (2008); *Gordon v. Holder*, No. 10-cv-5227, 2011 WL 559002, at *1 (D.C. Cir. Feb. 18, 2011). The purpose of a preliminary injunction "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It is an extraordinary form of interim relief, however, and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal citations omitted).

These four preliminary injunction factors "interrelate on a sliding scale," and the Court must balance the strengths of the factors against each other. *Ass'n of Cmty. Orgs. for Reform Now v. FEMA*, 463 F. Supp. 2d 26, 33 (D.D.C. 2006)(citing *Serono Labs v. Shalala,* 158 F.3d 1313, 1318 (D.C. Cir. 1998)). A particularly weak argument for one factor may be more than the other factors can compensate for, however. *See, e.g., Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1507 (D.C. Cir. 1995) (finding that given the inadequacy of the plaintiff's prospects for success on the merits, there may be no showing of irreparable injury that would entitle him to injunctive relief). In meeting the requisite burden for injunctive relief, "it is particularly important for the movant to demonstrate a likelihood of success on the merits." *Konarski v. Donovan*, No. 10-cv-1733, 2011 WL 383995, at *2 (D.D.C. Feb. 7, 2011). Without a "substantial indication" of the plaintiff's likelihood of success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Elite Entm't, Inc. v. Reshammiya*, No. 08-0641, 2008 U.S. Dist. LEXIS 31580, at *4 (D.D.C. Apr. 18, 2008)(citing *Am. Bankers Ass'n v. Nat'l Credit Union Admin.,* 38 F. Supp. 2d

114, 140 (D.D.C. 1999)).  Assessing the likelihood of success on the merits, particularly where, as here, the full administrative record is not before the Court, "does not involve a final determination of the merits, but rather the exercise of sound judicial discretion on the need for interim relief." *Nat'l Org. for Women, Wash. D.C. Chapter v. Soc. Sec. Admin. of the Dep't of Health and Human Servs.*, 736 F.2d 727, 733, (D.C. Cir. 1984) (footnote and internal quotation marks omitted).

For the following reasons, the Court DENIES plaintiffs' motions for injunctive relief because they have failed to establish a likelihood of success on the merits.

**B. DISCUSSION**

Plaintiffs' motions for injunctive relief require the Court to prospectively assess the merits of the plaintiffs' cases and their need for immediate judicial intervention.  Although plaintiffs' affiants claim irreparable harm if the Rule becomes effective, the grounds plaintiffs have proffered for challenging the Rule do not appear to have a high likelihood of success. Judicial review of agency action is afforded considerable deference; and even though mortgage brokers will be substantially affected by the Rule, this injury cannot overcome plaintiffs' failure to show that the Rule was issued without authority or is arbitrary or capricious.

**1.  Plaintiffs Have Associational Standing**

At the outset, in evaluating plaintiffs' likelihood of success on the merits, the Court must first determine that these two associations have standing to bring this action challenging the Final Rule.[7]  "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the

_____

[7] While the Board raises no issue concerning the plaintiffs' standing, the Court must satisfy itself that it may properly exercise jurisdiction over the action.  *See Summers v. Earth Island Inst.*, 129 S.Ct. 1142, 1152 (2009) ("it is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties"); *Fund Democracy LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002); *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 814-15  (D.C. Cir. 2006).

organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000); *see also Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, No. 11-cv-1138, slip op. at 2 n.2 (D.C. Cir. Mar. 29, 2011) (quoting *Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009). Thus, in analyzing standing, the pertinent inquiry is whether the underlying three-pronged requirement for associational standing has been met: namely, whether plaintiffs' members would have standing to sue in their own right; whether the interests at stake are germane to the organization's purpose; and whether the claim or relief requested requires the participation of individual members in the lawsuit. *Am. Chem. Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006)(citing *United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.,* 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977))).

As to the first prong, an association's members "have standing to sue in their own right," when they have (1) "suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quotations and citations omitted); *see also Fund Democracy LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002)(citing *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)). The record on the standing issue consists of the Complaints and affidavits filed by both plaintiffs. In its Complaint, plaintiff NAIHP avers that it is a for-profit corporation representing thousands of

independent housing professionals from around the country, including mortgage brokers and at least one member who has standing to sue in its own right. NAIHP Compl., ¶¶ 6, 9, 12; *see also* Savitt Aff., ¶ 1. The NAIHP Complaint further alleges that its members will be harmed by the Final Rule, which will "limit [] the compensation of loan originators who are independent mortgage brokers," "effectively prevent mortgage brokers from competing for business in certain instances and force brokers to choose which regulations to violate in other instances." *Id.* at ¶¶ 39, 41. Likewise, plaintiff NAMB alleges that it is a not-for-profit trade association representing 6,000 mortgage broker members. NAMB Compl., ¶ 5. NAMB alleges that the portion of the Final Rule that prohibits "mortgage brokers from paying their employee/loan officers a commission in a Consumer Pay Transaction has already begun to and will continue to cause immediate, catastrophic and far-reaching harm." *Id.* at ¶ 40.

The Board's "Supplementary Information" in connection with publication of the Final Rule acknowledged the real, concrete and directly traceable impact of this Rule on the members of both associations that are mortgage brokers and loan originators. The Board acknowledged that, "the Board believes that this Final Rule will have a significant economic impact on a substantial number of small entities," and recognized that many of these entities would be "small mortgage broker entities." Board Notice of Final Rule, 75 Fed. Reg. 58,530, 58,532. The Board further found that "these smaller entities may experience relatively higher costs to implement the final rule," but nevertheless concluded that "the benefits of the [loan originator compensation] prohibition outweigh the associated compliance costs." *Id.* at 58,518.

As to the second prong, NAMB states that in representing mortgage brokers, it "advocates for public policies that serve the mortgage consumer by promoting competition, facilitating homeownership and ensuring quality service." NAMB Compl., ¶ 5. NAIHP similarly

"represents the interests of homebuyers and advocates for public policies that serve the mortgage consumer by promoting competition, facilitating homeownership and ensuring quality service." NAIHP Compl., ¶ 12. Both associations have purposes that are focused on the policy issues affecting mortgage brokers and loan originators that are at stake in this litigation.

Finally, the relief sought by both plaintiffs to enjoin enforcement of the Final Rule does not require the participation of individual members of either association for this relief to be effective. Thus, the Court finds that the Complaints' allegations, together with the supporting affidavits submitted by the plaintiffs, sufficiently establish associational standing by both NAIHP and NAMB to challenge the Final Rule.

## 2. Plaintiffs Have Not Demonstrated Their Likelihood of Success on the Merits

In order to succeed on the merits, plaintiffs must demonstrate under the Administrative Procedure Act ("APA") that the Board's action in promulgating the Rule was arbitrary or capricious, or in excess of statutory authority. 5 U.S.C. § 706(2)(A),(C). Plaintiffs assert two principal grounds for challenging the Board's Rule: First, plaintiffs argue that the Board does not have statutory authority to regulate the compensation of loan originators under TILA. Second, even if the Board does have authority to promulgate the Rule, plaintiffs contend that the Rule is arbitrary and capricious. Plaintiffs' arguments are likely to be unavailing on both counts.

As discussed more fully below, the Court holds that TILA grants the Board broad authority to regulate unfair and deceptive practices in connection with consumer mortgage loans, and this authority includes the power to issue regulations pertaining to loan originator compensation practices that it perceives to be unfair. Further, the current record before the Court does not support the plaintiffs' contention that the Board acted arbitrarily or capriciously in promulgating the Rule. Rather, the Rule has rational support and explanation.

The plaintiffs' likelihood of success on the merits is therefore low. Given this low probability of success on the merits, even when balanced against the potential irreparable harm the plaintiffs' members may face, the plaintiffs have not met their burden of persuading the Court that injunctive relief is necessary.

### a. The Board's Authority to Promulgate the Rule Under TILA

Plaintiffs argue that the Board exceeded its authority under TILA when it undertook to regulate compensation for loan originators. Specifically, NAIHP argues that the "Board is without authority to regulate the compensation of non-bank loan originators or to apply provisions of 15 U.S.C. §1639 (l)(2)(A) [the TILA section relied upon by the Board to promulgate the Final Rule] to mortgages other than those covered by Section 1639." NAIHP Mem., at 2, 14-17. NAMB further argues that the Board exceeds its authority in attempting to regulate mortgage brokers, "who are not subject to the restrictions and requirements of TILA." NAMB Mem., at 35. The Court disagrees.

Under the APA, the Court must set aside agency actions that are in excess of the agency's statutory jurisdiction, authority, or limitations. 5 U.S.C. § 706(2)(C). To determine whether an agency exceeded its statutory authority, the Court must engage in the two-step inquiry established by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984). *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000); *Bhd. of R.R. Signalmen v. Surface Transp. Bd.*, No. 11-cv-1138, slip op. at 7 (D.C. Cir. Mar. 29, 2011). *Chevron* directs the Court first to ask "whether Congress has directly spoken to the precise question at issue." *Bhd. of R.R. Signalmen*, No. 11-cv-1138, slip op. at 7 (quoting *Chevron*, 467 U.S. at 842). If so, the inquiry is at an end; the court "must give effect to the unambiguously expressed intent of Congress." *Id.* (quoting *Chevron*, 467 U.S. at 843). If the

statutory text is silent or unclear with respect to the particular question, the Court must then evaluate whether the agency's action is based upon a permissible construction of the statute. *Id.* (quoting *Chevron*, 467 U.S. at 843). For this second step of the *Chevron* analysis, the Court notes that the Board has been granted a special degree of deference in its administration of the TILA. *See Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981) ("absent some obvious repugnance to the statute, the Board's regulation implementing [TILA] should be accepted by the courts . . ."); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559-60 (1980); *Mourning v. Family Publ'n Serv., Inc.*, 411 U.S. 356, 369-71 (1973). Congress delegated "expansive authority" to the Board in order to "elaborate and expand the legal framework governing commerce in credit." *Milhollin,* 444 U.S. at 559-60. As such, the Congress gave the Board "broad administrative lawmaking power" and "designated [the Board] as the primary source for interpretation and application of the truth-in-lending law." *Id.* at 566.

In promulgating the challenged Rule, the Board relied on the authority granted to the agency under TILA,[8] 15 U.S.C. §1639 (l)(2).[9] Board Notice of Final Rule, 75 Fed. Reg. 58,509. This provision authorizes the Board to "prohibit acts or practices in connection with -- (A) mortgage loans that the Board finds to be unfair, deceptive, or designed to evade the provisions

---

[8] On July 21, 2011, pursuant to the Dodd-Frank Wall Street Reform and Consumer Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (the "Dodd-Frank Act"), the newly formed Consumer Financial Protection Bureau ("CFPB") will assume primary regulatory authority over the mortgage industry and exclusive rulemaking authority under TILA and HOEPA. Bureau of Consumer Financial Protection, Designated Transfer Date, 75 Fed. Reg. 57,252 (Sept. 20, 2010); *see also* Dodd-Frank Act, § 1002(12), 124 Stat. 1957; §1012(a)(10), 124 Stat. 1965. Plaintiffs contend that the imminent transfer of the Board's authority to promulgate regulations under TILA and HOEPA should weigh in favor of temporarily enjoining the Rule. As the Board indicated at oral argument, however, until the CFPB assumes its authority the Board has power to promulgate rules and regulations under TILA and HOEPA. *See* Transcript of Oral Argument at 41-43, NAIHP v. Bd. of Governors of the Federal Reserve Sys., No. 11-cv-489, NAMB v. Bd. of Governors of the Fed. Reserve Sys., No. 11-cv-506 (Mar. 29, 2011). If Congress had intended to limit the Board's power to promulgate such rules before the CFPB assumes authority, it could have done so.

[9] Section 1639(l)(2) was enacted in 1994 under the Home Ownership and Equity Protection Act (HOEPA), Pub.L. 103-325, 15 U.S.C. § 1639 *et seq.*, which amended TILA to add protections for borrowers involved in "high cost" loan transactions and, more generally, to prevent abusive lending practices. *See generally Cooper v. First Gov't Mortg. and Investors Corp.*, 238 F. Supp. 2d 50, 54 (D.D.C. 2002) ("Faced with increasing reports of abusive practices in home mortgage lending, Congress enacted HOEPA in 1994 as an amendment to TILA.").

of this section; and (B) refinancing of mortgage loans that the Board finds to be associated with abusive lending practices, or that are otherwise not in the interest of the borrower."  15 U.S.C. § 1639(l)(2).

NAIHP contends that Section 1639(l)(2) "applies only to the high-cost mortgages and the creditors using such mortgages that are described in 15 U.S.C. § 1602(aa)."[10] NAIHP Mem., at 16.  The text of Section 1639(l)(2), however, indicates no such limitation.  Other subsections of Section 1639 apply only to high cost mortgages, as defined in Section 1602(aa), and the text of those subsections contain language indicating that the provisions apply to mortgages "referred to in section 1602(aa)."  *See, e.g.,* 15 U.S.C. §§ 1639 (a)(1); (c)(1)(A); (d)-(h). Noticeably absent from Section 1639(l), however, is any reference to Section 1602(aa) mortgages.  Rather, Section 1639(l)(2) instructs the Board to regulate unfair and deceptive practices "in connection with" "mortgage loans" and "mortgage refinancing."  The text of Section 1639(l)(2) is broad and provides no indication that it is to be limited in scope, let alone limited to high cost mortgages under section 1602(aa).  If Congress intended such a limitation on the Board's authority in Section 1639(l)(2), Congress would and could have included within the text of that subsection language referring to Section 1602(aa) high-cost mortgages, just as it did for other subsections in Section 1639.  The Court will not read into 15 U.S.C. § 1639 (l)(2) language that is simply not there.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")(quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972); *see also*

---

[10] Section 1602(aa) defines high-cost mortgages, which Congress initially described as those in which "the annual percentage rate at consummation of the transaction will exceed by more than 10 percentage points the yield on Treasury securities having comparable periods of maturity. . . or . . . the total points and fees payable by the consumer at or before closing will exceed the greater of  (i) 8 percent of the total loan amount; or (ii) $400."  15 U.S.C. § 1602(aa)(1)(A). Congress authorized the Board to adjust these cost-thresholds every two-years. 15 U.S.C. § 1602(aa)(2).

*Milhollin*, 444 U.S. at 565 ("[L]egislative silence is not always the result of a lack of prescience; it may instead be betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme."); *see also TRW, Inc. v. Andrews*, 534 U.S. 19, 21 (2001) ("[I]t is a cardinal principle of statutory construction that the statute ought, upon the whole, be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void or insignificant.")(internal quotations and citations omitted).

Plaintiff NAMB alternatively contends that the Board is without authority to regulate mortgage brokers' compensation because TILA and HOEPA "apply only to 'creditors,' as that term is defined in 15 U.S.C. § 1602(f)," and this definition cannot include mortgage brokers. NAMB Mem., at 36. NAMB is correct that 'creditor,' as defined in Section 1602(f), does not include mortgage brokers.[11] *See Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 273 (4th Cir. 2008); *Robey-Harcourt v. Bencorp Fin. Co.*, 326 F.3d 1140, 1142 (10th Cir. 2003); *Davis v. Wilmington Fin. Inc.*, No. 09-cv-1505, 2010 WL 1375363, at *4 (D. Md. May 26, 2010). The TILA provision, Section 1639(l)(2), which is relied upon by the Board in promulgating the Rule, grants broad discretionary authority to the Board without any reference or limitation to "creditors." In short, there is no textual basis for NAMB's assertion that the Board's authority under Section 1639(l)(2) is limited only to creditors. Rather, the language of the statute is clear

---

[11] TILA defines a creditor as "a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(f). Mortgage brokers are not persons to whom the consumer's debt is initially payable. *See Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 269 (4th Cir. 2008) ("It is undisputed that [the mortgage broker] is not a "creditor" according to § 1602(f)'s *first* sentence, because [the mortgage broker] is not 'the person to whom the debt arising from [the loan] is initially payable' on the face of the loan documents.") (emphasis in original).

that the Board has power to regulate all practices "in connection" with mortgage loans that the Board finds to be unfair, deceptive, or designed to evade disclosure requirements.

The statute the Board relies upon for authority to promulgate the Rule grants the agency broad authority to do so.  Section 1639(l)(2) is not limited to high-cost mortgages as defined in 5 U.S.C. §1602(aa), nor does the Board's authority under that section apply only to "creditors" as defined in 1602(f). Given that the language of Section 1639(l)(2) is broad and unambiguous on its face, the Court need not move to the second-step of the *Chevron* analysis because "that is the end of the matter, for the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

### b.  The Rule is Not Arbitrary and Capricious

Plaintiffs next contend that the Rule should be set aside because it is arbitrary and capricious.  The APA instructs the Court to set aside agency actions that are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Examination of the Board's rationale for issuance of the Rule -- even based upon the limited record before the Court at this stage of the case -- makes clear that the Rule is not unreasonable, without factual basis, or irrational, and that, therefore, the plaintiffs are unable to demonstrate a substantial likelihood of success in challenging the Rule on this basis.

### i.  *"Arbitrary or Capricious" Standard of Review*

In evaluating agency actions under the "arbitrary or capricious" standard, the Court must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 378 (1989) (internal quotation marks and citation omitted).  The scope of this review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor*

*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The Court must

look to see "whether the decision was based on a consideration of the relevant factors and

whether there was clear error of judgment." *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C.

Cir. 1997) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43).

    At the very least, the agency must have reviewed relevant data and articulated a

satisfactory explanation establishing a "rational connection between the facts found and the

choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43 (internal quotation omitted); *see also Pub.

Citizen, Inc. v. Fed. Aviation Admin.,* 988 F.2d 186, 197 (D.C. Cir. 1993)("The requirement that

agency action not be arbitrary or capricious includes a requirement that the agency adequately

explain its result."). If an agency "failed to provide a reasoned explanation, or where the record

belies the agency's conclusion, [the court] must undo its action." *Cnty. of Los Angeles v.

Shalala,* 192 F.3d 1005, 1021 (D.C. Cir.1999). Agency actions are found to be arbitrary and

capricious if the agency "relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not

be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs.*, 463

U.S. at 43. The agency's explanation cannot "run [ ] counter to the evidence," *id.*, but Courts

should "uphold a decision of less than ideal clarity if the agency's path may reasonably be

discerned." *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974).

    The Court starts with the assumption that the agency action is valid. *Envtl. Def. Fund,

Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir. 1981). In cases involving scientific or technical

decisions within the agency's area of expertise, an informed agency decision is entitled to a

"high level of deference." *Serono Labs., Inc. v. Shalala,* 158 F.3d 1313, 1320 (D.C. Cir. 1998).

This is particularly true when the Court reviews the Board's actions with respect to TILA. "Deference is especially appropriate in the process of interpreting the Truth and Lending Act and Regulation Z. Unless demonstrably irrational, [the Board's] opinions construing the Act or Regulation should be dispositive . . . ." *Milhollin,* 444 U.S. at 565. "Thus, while not abdicating their ultimate judicial responsibility to determine the law, judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational." *Id.* at 568 (internal citations omitted).

As discussed above, the Board promulgated its Rule pursuant to 15 U.S.C. § 1639(l)(2), which authorizes the Board to proscribe practices in connection with mortgage loans that are found to be "unfair" or "deceptive." Plaintiffs argue that the Board's Rule is arbitrary and capricious because the Board failed to substantiate its claim that the prohibited loan originator compensation practices are "unfair" or "deceptive" under Section 1639(l)(2). The Court does not believe the plaintiffs have shown a likelihood of prevailing on the merits of this challenge to the Rule.

TILA and HOEPA do not set forth a standard to determine what constitutes "unfair" or "deceptive" under Section 1639(l)(2). Rather, the Board must demonstrate that the practices it prohibits fall within the meaning of those terms as interpreted by Section 5 of the FTC Act. Board Notice of Final Rule, 75 Fed. Reg. 58,513 (". . . in determining whether a practice in connection with mortgage loans is unfair or deceptive, the Board [looks] to the standards employed for interpreting state unfair and deceptive trade practices statutes and the Federal Trade Commission Act (FTC Act), Section 5(a), 15 U.S.C. § 45(a)."); *see also* 15 U.S.C. § 45(a); NAIHP Mot. Prelim. Inj., Ex. 2, Board of Governors of the Federal Reserve System,

Unfair or Deceptive Acts or Practices by State-Chartered Banks (Mar. 11, 2004)(elaborating on Board's interpretation of Section 5 of the FTC Act) (hereinafter "Board FTC Statement").

The Board justifies the Rule under the "unfairness" prong of its authority. Under the FTC Act, a practice is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." Board FTC Statement, at 2; *see also* 15 U.S.C. § 45(n). An injury may be considered substantial even if it "causes a small amount of harm to a large number of people." Board FTC Statement, at 3; *see also* Board Notice of Final Rule, 75 Fed. Reg. 58,513. A practice is not unfair, however, if consumers can "reasonably avoid" injury. Board FTC Statement, at 3. "Consumers cannot reasonably avoid injury from an act or practice if it interferes with their ability to effectively make decisions." *Id.* That said, to be "unfair" within the meaning of the FTC Act, "the practice must be injurious in its net effects" and not "outweighed by any offsetting consumer or competitive benefits." *Id.*

To assess whether the Board failed to adequately justify its decision to implement the Rule, the Court reviews each of the three challenged regulations prohibiting types of loan originator compensation and evaluates the Board's rationale for each.

>    ii.     *§ 226.36(d)(1) – Prohibition on Loan Originator Compensation Based on the Terms of a Mortgage Loan Transaction*

NAIHP challenges proposed regulation 226.36(d)(1), which prohibits "any person from compensating a loan originator, directly or indirectly, based on the terms or conditions of a loan transaction secured by real property or a dwelling." Board Notice of Final Rule, 75 Fed. Reg. 58, 516, 58,534. The Board explains that this provision is aimed at preventing consumers from unsuspectingly agreeing to loans with higher interests rates and less favorable terms, an injury

that consumers cannot reasonably avoid given current industry practices.  *Id.* at 58,514-15.  The record currently before the Court supports this reasoning, and adequately demonstrates that the practice the Board is seeking to prohibit through § 226.36(d)(1) could be viewed as unfair.  The Court therefore concludes that NAIHP does not have a likelihood of success on the merits of its challenge to this provision of the Rule.

In its commentary regarding § 226.36(d)(1), the Board explains its view that the specific prohibition on loan originator compensation based on the terms or conditions of the transaction, would help correct "misaligned incentives that currently exist in the mortgage marketplace between loan originators and consumers."  *Id.* at 58,514.  Clearly, a number of public and private stakeholders concur in this assessment, since the Board notes that "consumer groups, state and Federal regulators, state attorneys general, and several members of Congress strongly supported the proposed prohibition." *Id.*

Based upon information received at hearings, in comments, from studies, and its own analysis, the Board stated that the current compensation structure in which a mortgage broker's payment is tied to loan terms, creates "an incentive [for loan originators] to provide consumers loans with higher interest rates or other less favorable terms."  *Id.* at 58,515.   This incentive is particularly strong when mortgage brokers receive yield spread premiums (YSPs) for providing consumers with loans above a lender's "par rate."[12]  The Board concluded that the YSP

---

[12] As noted earlier in this opinion, consumers may opt to purchase loans above a lender's par rate, with YSPs, when they are unable to pay the upfront cost associated with a loan, in which case these upfront costs are spread over the course of the loan in return for a higher interest rate on the overall transaction. The Rule does not affect the ability of consumers to choose this option as a means of reducing the upfront costs of a home mortgage. *See* Board Notice of Final Rule, 75 Fed. Reg. 58,516 (". . . the final rule still afford creditors flexibility to structure loan pricing to preserve the potential consumer benefit of compensating an originator, or funding third-party closing costs, through the interest rate."). When a mortgage broker or loan originator, however, controls the YSP that applies to a particular transaction, and uses the YSP, in whole or part, as compensation for the broker's services, consumers may be unaware of the amount of the YSP attributable to the broker's compensation. The Rule addresses only this use of a YSP. *See* Board Notice of Proposed Rule, 74 Fed. Reg. 43,282 (". . .the Board is proposing a rule that prohibits any person from basing a loan originator's compensation on the loan's rate or terms but still affords creditors the

compensation practice "present[s] a significant risk of economic injury to consumers" who "typically are not aware of the practice or do not understand its implications." *Id.* Consumers lack knowledge and understanding regarding how YSPs operate to provide compensation to brokers and loan originators, and are thus "unable to engage in effective negotiation. Instead they are more likely to rely on the loan originator's advice, and, as a result, may receive a higher rate or other unfavorable terms solely because of greater originator compensation." *Id.* Under the FTC Act, an injury is considered substantial even if it "causes a small amount of harm to a large number of people." Board FTC Statement, at 3. The Board has adequately reasoned that consumers face such harm when they "incur[] greater costs for mortgage credit than they would otherwise be required to pay." Board Notice of Final Rule, 75 Fed. Reg. 58,514.

The Board has further adequately reasoned that this injury is not reasonably avoidable. Even though mortgage brokers operate on behalf of neither the consumer nor the creditor, "reasonable consumers [may] erroneously [] believe that loan originators are working on their behalf, and are under a legal or ethical obligation to help them obtain the most favorable loan terms and conditions. Consumers may regard loan originators as 'trusted advisors' or 'hired experts,' and consequently rely on originators' advice." *Id.; see also id.* at 58,511 ("Several commenters in connection with the 2006 hearings suggested that mortgage broker marketing cultivates an image of the broker as a 'trusted advisor' to the consumer."). Due to this "trusted advisor" perception of loan originators; the lack of transparency in creditor payments to loan originators, "especially in the case of mortgage brokers;" the lack of consumers' understanding of YSP and their consequent inability to "engage in effective negotiation," the Board found that consumers suffered a significant risk of economic injury from YSPs used to compensate loan

---

flexibility to structure loan pricing to preserve the potential consumer benefit of compensating an originator through the interest rate.").

originators based on a transaction's terms and conditions. *Id.* at 58,515. Moreover, based on consumer testing the Board concluded that relying on increased disclosures would not be sufficient to protect consumers from the "conflict of interest" and incentive that loan originators have to "provide consumers loans with higher interest rates or other less favorable terms" in order to increase their commissions based upon terms other than the amount of the loan. *Id.* at 58,514-15 (disclosure insufficient for YSPs, which "are complex and may be counter-intuitive even to well-informed consumers, . . . to overcome the gap in consumer comprehension regarding this critical aspect of the transaction.").

The Board acknowledged that YSPs may be beneficial to those consumers who use this mechanism to reduce the upfront closing costs, including originator compensation, and therefore "the final rule still afford creditors the flexibility to structure loan pricing to preserve the potential consumer benefit of compensating an originator, or funding third-party closing costs, through the interest rate." *Id.* at 58,516. The Rule, however, prohibits any compensation paid to the loan originator from being based upon any terms or conditions of the loan other than the credit extended. The record before the Court supports the Board's reasoning, and this reasoning is not arbitrary and capricious. The Court therefore concludes that the NAIHP does not have a likelihood of success in its challenge of this provision of the Rule.

### *iii. Proposed § 226.36(d)(2) – Anti-Split Compensation*

Both plaintiffs challenge proposed regulation § 226.36(d)(2), which provides that, if a loan originator is compensated directly by the consumer for a transaction secured by real property or a dwelling, no other person may pay any compensation to the originator for that transaction. The Board contends that proscribing loan originators from receiving payments from other industry actors, even by their own employer on a commission basis, further eliminates a

loan originator's incentive to direct consumers toward unfavorable loans. Board Notice of Final Rule, 75 Fed. Reg. 58,524-25. Based upon the current record, the Board had an adequate basis in promulgating this regulation and in concluding that the split-compensation model for loan originators is an unfair practice warranting the prohibition. The plaintiffs therefore do not ultimately have a likelihood of success in their argument that the Board's decision to prohibit this practice is arbitrary and capricious.

Under 12 CFR § 226.36(d)(2), a "loan originator" is not allowed to be compensated by any other person if he or she receives compensation directly from a consumer. The proposed rule defines "loan originator" as "any person who for compensation or other monetary gain arranges, negotiates, or otherwise obtains an extension of consumer credit for another person." *Id.* at 58,534-35. This definition is not limited to natural persons and, thus, necessarily includes mortgage brokerage companies as well as the brokerages' individual employee-loan officers. Given the potentially broad reach of a literal reading of § 226.36(d)(2), the Board clarified that "compensation paid by a mortgage broker company to an employee in the form of a salary or hourly wage, which is not tied specifically to a single transaction, does not violate § 226.36(d)(2)." Board Notice of Proposed Rule, 74 Fed. Reg. 43,409. The effect of § 226.36(d)(2) is that it prohibits mortgage brokers from paying their own employee-loan officers a commission if the broker or employee "receives compensation directly from a consumer." Although the definition of "loan originator" also applies to a creditor's *employees*, it does not generally apply to the creditor itself. Board Notice of Final Rule, 75 Fed. Reg. 58,533-34. Creditors are therefore free to pay their employees, who also originate loans, on a commission basis as long as the commission is not based on the terms of the loan, as prohibited by § 226.36(d)(1).

To evaluate whether the Board was authorized to promulgate 12 CFR § 226.36(d)(2) the Court must consider whether the Rule regulates an unfair practice within the understanding of the FTC Act and is aimed to prevent a substantial injury. The record before the Court indicates that the regulation was promulgated to prevent loan originators from directing consumers toward unfavorable loans for the loan originator's personal benefit. Board's Notice of Proposed Rule, 74 Fed. Reg. 43,282. Proposed § 226.36(d)(2) would purportedly prevent this injury "because the loan originator could not receive compensation based on the interest rate or other terms, the originator would have no incentive to alter the terms made available by the creditor to deliver a more expensive loan." *Id.* The Board reasoned that without prohibiting loan originators from receiving split-compensation for a specific loan transaction, loan originators would still be inclined, even with the other prohibitions, to direct consumers to unfavorable loans because they could receive increased compensation from other sources, including their employer, for doing so.[13] Without subsection (d)(2), the Board was concerned that "loan originators [could] evade the prohibition on loan originator compensation based on the terms and conditions of a transaction [§ 226.36(d)(1)]." Board Notice of Final Rule, 75 Fed. Reg. 58,525 (further stating that "[a]llowing the originator to receive compensation directly from the consumer while also accepting payment from the creditor in the form of a yield spread premium would enable the originator to evade the prohibition in § 226.36(d)(1)."). As discussed above, when consumers are directed toward

---

[13] At oral argument, the Board provided additional detail that this rule would eliminate a loan originator's incentive to "steer" a consumer to a "consumer pay" transaction, in which the more experienced broker would be able to negotiate a larger broker payment on which the loan officer could obtain a larger commission, since, under this Rule, the broker is barred from paying *any* commission to the loan officer on a "consumer pay" transaction. Transcript of Oral Argument at 56-57, NAIHP v. Bd. of Governors of the Federal Reserve Sys., No. 11-cv-489, NAMB v. Bd. of Governors of the Fed. Reserve Sys., No. 11-cv-506 (Mar. 29, 2011)(" . . . the reason behind the portion of the reg that NAMB is concerned with has to do with steering consumers between the consumer-pay and the creditor-pay transaction. Because in the consumer-pay transaction, the mortgage brokerage company is able to negotiate anything it can with the consumer, and it's not limited by the (d)(1) provisions. . . . So the only thing that keeps the mortgage broker employee from steering towards consumer-pay and away from any creditor-pay transaction is requiring that the mortgage broker employees can't get a piece of what the mortgage broker gets on that transaction.").

unfavorable loan transactions, the harm constitutes a substantial injury under the terms of the FTC Act. The Court must now inquire whether this injury is reasonably avoidable.

The Board believes that "consumers generally are not aware of creditor payments to originators and may reasonably believe that when they pay a loan originator directly, that amount is the only compensation the loan originator will receive." *Id*. Even when consumers are aware that a loan originator is receiving compensation from other sources, the Board contends that "the consumer could reasonably expect that making a direct payment to an originator would reduce or eliminate the need for the creditor to fund the originator's compensation through the consumer's interest rate. Because yield spread premiums are not transparent to consumers, however, consumers cannot effectively negotiate the originator's compensation." *Id.* Thus, the Board reasons that even with disclosure of a loan originator's alternate sources of compensation, the consumer's injury is not reasonably avoidable.

The Court finds that the overall reasoning of § 226.36(d)(2) is supported in the record before the Court, which indicates that the anti-split compensation provision is directed toward preventing substantial injury that is not reasonably avoidable. The Court must address, however, NAMB's contention that this Rule is nonetheless arbitrary and capricious because of the Board's determination that § 226.36(d)(2) should also prohibit mortgage brokers from compensating their employees on a commission basis when the mortgage broker is compensated directly by a consumer. According to NAMB, the bar on commissions "micromanages how a mortgage brokerage company can distribute[] its portion of the **single** origination fee it receives from a consumer to its own loan officer." NAMB Resp. to Amicus Curiae Br., ECF No. 27, at 5 (emphasis in original). NAMB additionally argues that this prohibition will effectively destroy the business of the independent mortgage broker, who can no longer employ loan officers on a

commission-basis, and must compete with banks that, as creditors, are exempt from this part of the Rule and permitted to continue paying loan officers on a commission-basis. According to NAMB, loan officers are leaving independent mortgage companies in droves in order to continue being paid on a commission basis with banks or other creditors. NAMB Mem., at 10 ("Loan officers are already being solicited by banks who are telling them that all mortgage brokers will be out of business after April 1, 2011 because they have no economically viable business model to turn to. The exodus of these loan officers, who are the life-blood of the industry . . . , [is] causing and will continue to cause severe and irreparable harm to mortgage brokers.").[14] NAMB further states that this apparent inequity in treatment between independent mortgage brokers and "creditors," including banks, will result in less competition and consumers being provided fewer financing choices. *Id*.

The Board, however, explains that § 226.36(d)(2)'s associated bar on mortgage broker commissions in consumer pay transactions is necessary to prevent mortgage brokerages from evading the prohibitions of § 226.36(d)(1) by structuring commission payments that, while not based on the terms of a loan, nonetheless provide incentives for their employees to steer consumers toward particular loans. The reason why creditors are exempt from § 226.36(d)(2), according to the Board, is "simple: because all transactions are subject to the Rule's restrictions on 'creditor-pay' transactions, any compensation paid to the creditor from any source is limited by this Rule," i.e., § 226.36(d)(2) prevents unfair practices when a consumer pays a mortgage broker directly, and a creditor's employee never has the option of receiving direct compensation from a consumer. Thus, proposed regulation § 226.36(d)(1), which prevents any compensation

---

[14] The Board acknowledges that another federal agency, the Small Business Administration (SBA) had cautioned that this part of the proposed rule "would disproportionately affect small brokerage firms and create an unlevel playing field…[L]arge brokerage firms would be 'creditors' who are not subject to the compensation restrictions because they can and would fund loans out of their own resources, …[T]he proposal would force small brokerage firms who are unable to fund loans out of their own resources out of the marketplace." Board Notice of Final Rule, 75 Fed. Reg. 58,517.

model based on the terms of the transaction, by itself, ensures that creditors' employees have no direct monetary incentive to direct consumers toward loans with higher rates or more adverse terms. Defs' Mem., at 36-37. The same is not true, however, for mortgage brokers. Although § 226.36(d)(1) prevents mortgage brokers from receiving compensation tied to the terms of a loan, it does not prevent them or their employees from creating incentives for a loan officer to guide consumers toward certain loans and or to certain lenders. The anti-split compensation provision, § 226.36(d)(2), therefore forces loan officers to abandon all other sources of compensation tied to a particular transaction, including commission from their employers, when a consumer compensates a broker and assumes that the broker will guard his or her interests.

Regarding the Rule's likely adverse effect on small mortgage brokers, the Board concluded that "the benefits of the prohibition to consumers outweigh the associated compliance costs." *Id*. at 58,518. In reaching this conclusion, the Board considered studies about the benefits of independent mortgage brokers to consumer choice and costs, but found them "not dispositive." It also indicated its belief that the Rule would not "require small brokerage firms to go out of business," since creditors rely on them, and its optimistic view that "new business models" will allow them to compete.[15] *Id.* at 58,517-18.

---

[15] The Board contends that the anti-split compensation provision does not bar mortgage brokers from structuring commission based on loan or transaction volume. *See* Transcript of Oral Argument at 64-65, NAIHP v. Bd. of Governors of the Federal Reserve Sys., No. 11-cv-489, NAMB v. Bd. of Governors of the Fed. Reserve Sys., No. 11-cv-506 (Mar. 29, 2011). In their briefs and at oral argument, plaintiffs argued that the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq,* prevents mortgage brokers from compensating their employees with commissions based on loan volume. *See id.* at 72-73. To support this position, NAIHP's counsel provided the Court with a RESPA compliance guide published by the U.S. Department of Housing and Urban Development in response to the Board's Rule, which he argued supported plaintiffs' position. U.S. DEP'T OF HOUS. AND URBAN DEV., RESPA ROUNDUP: COMPLIANCE GUIDE FOR RESPA AS IT APPLIES TO THE FEDERAL RESERVE BOARD'S MLO COMPENSATION RULES PUBLISHED ON SEPTEMBER 24, 2010 (MAR. 2011). This compliance guide, however, states that "[i]f *a lender* is basing its compensation *to mortgage brokers* on loan volume" a RESPA violation may exist under 12 U.S.C. § 2607. *Id.* at 7 (emphasis added). The compliance guide does not suggest that RESPA prevents mortgage brokers from compensating its employees based on loan volume. The Board maintains that RESPA does not prevent mortgage brokers from paying its employees commissions based on loan volume; and the Court similarly has not been informed of a specific RESPA provision prohibiting this practice.

The Court is required to defer to the Board's considered judgment and rulemaking authority. The Board provided a rational explanation for proposing § 226.36(d)(2), sufficiently explained its reasoning in barring mortgage brokers from receiving commissions in consumer pay transactions, and has also explained the creditors' exemption from this prohibition. Proposed regulation § 226.36(d)(2) may have a substantial adverse effect on the mortgage broker industry, but the record before the Court does not indicate that the Rule is illogical or unsupported. Plaintiffs therefore do not have a high likelihood of success when they ultimately argue that this provision is arbitrary and capricious.

### iv. Proposed Regulation § 226.36(e) – Anti-Steering and Safe Harbor

NAIHP also challenges proposed regulation § 226.36(e), which prohibits loan originators from directing or "steering" consumers to loans based on the fact that the originator will receive additional compensation, when that loan may not be in the consumer's interest. The Board explains that this rule is promulgated to "prevent circumvention of the prohibition in § 226.36(d)(1), which could occur if the loan originator steered the consumer to a loan with a higher interest rate or higher points to increase the originator's compensation." *Id.* at 58,527; *id* at 58,528 (the anti-steering rule prevents loan originators from directing consumers to "a single creditor that offers greater compensation to the originator, while ignoring possible transactions having lower interest rates that are available from other creditors."). This "anti-steering" regulation contains safe-harbor provisions, §§ 226.36(e)(2) and (3), so that loan originators would be deemed to comply with the Rule if, under specified conditions, the consumer is presented with a choice of loan options that include (1) the lowest interest rate, (2) the second lowest interest rate, and (3) the lowest total dollar amount for origination points or fees and discount points. *Id.* Given these safe-harbors, proposed § 226.36(e) effectively operates more as

a requirement that loan originators disclose to the consumer the most objectively favorable financing products.

In promulgating this rule, the Board reasoned that the anti-steering rule was "necessary to prevent the harm that results if loan originators steer consumers to a particular transaction based on the amount of compensation paid to the originator when that loan is not in the consumer's interest." *Id.* at 58,528. The Board concluded that consumers cannot reasonably avoid being misled by mortgage brokers given the incentives for steering consumers toward loans that provide a personal benefit to the loan originator. *Id.* Consumers "generally are unaware of yield spread premiums and are unable to appreciate the incentives such compensation creates regarding the loan options a loan originator may choose to present to consumers." *Id.* Due to consumers' lack of experience in this industry and with mortgage compensation practices, "consumers are more likely to rely on a loan originator's advice regarding which loan transaction will be in their interest." *Id.* Nonetheless, the Board reasons that consumers could avoid injury when loan originators disclose the most objectively favorable financial products, and thus fall into § 226.36(e)'s safe harbor. The Board's reasoning in regards to proposed regulation § 226.36(e) is rational and supported in the record before the Court. The Court therefore finds that plaintiff NAIHP does not have a high likelihood of success when it challenges this provision on the grounds that the promulgated rule is arbitrary and capricious.

Based on the current record, the Court believes that proposed regulations §§ 226.36(d) and (e) are rational and directed toward preventing unfair practices, within the meaning of that term in Section 5 of the FTC Act. The Congress delegated the Board broad authority under TILA and HOEPA. As the Supreme Court noted, a Court that disregards the Board's views with regard to TILA "embarks on a voyage without a compass" because proper regulation of the

lending industry "is an empirical process that entails investigation into consumer psychology and that presupposes broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process." *Milhollin,* 444 U.S. at 568-59.

### c. Plaintiffs Have Not Demonstrated the Board's Failure to Comply with RFA and SBREFA

Pursuant to the Regulatory Flexibility Act ("RFA"), Pub.L. No. 96-354, 94 Stat. 1165-70 (1980), codified at 5 U.S.C. §§ 601-612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 ("SBREFA"), Pub.L. No. 104-121, 110 Stat. 864 (1996), agencies are required to prepare an initial regulatory flexibility analysis ("IRFA") when they propose a rule that will have an impact on "small entities," 5 U.S.C. § 603. In addition to an IRFA, when an agency promulgates a final rule, it must perform a Final Regulatory Flexibility Analysis ("FRFA"). This analysis is required to include:

(1) a succinct statement of the need for, and objectives of, the rule;

(2) a summary of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record; and

(5) a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a) (prior to Sept. 27, 2010 amendment).[16] RFA does not "alter in any manner standards otherwise applicable by law to agency action." 5 U.S.C. § 606. "[T]he Act's requirements are 'purely procedural' [and] though it directs agencies to state, summarize, and describe, the Act in and of itself imposes no substantive constraint on agency decisionmaking." *Nat'l Tel. Co-Op. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (internal quotations omitted). Thus, RFA only requires agencies to "publish analyses that address certain legally delineated topics [and when an agency] address[es] all of the legally mandated subject areas, it complies with the Act." *Id.* In addressing these topics, the agency "needn't present its FRFA in any 'particular mode of presentation,' as long as the FRFA 'compiles a meaningful, easily understood analysis that covers each requisite component dictated by the statute and makes the end product-whatever form it reasonably may take-readily available to the public.'" *Nat'l Ass'n of Psychiatric Health Systems v. Shalala*, 120 F. Supp. 2d 33, 42 (D.D.C. 2000) (quoting *Associated Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 115 (1st Cir.1997)). If an agency fails to comply with RFA, however, the Court may remand the rule to the agency. 5 U.S.C. § 611(a)(4)(A); *see also Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 538 (D.C. Cir. 1983) (failure to comply with the RFA "may be, but does not have to be, grounds for overturning a rule."). Additionally, when challenging an agency's obligations under Section 604, parties may raise the "related but distinct claim" that an agency did not reasonably address the Rule's impact on small businesses. *Nat'l Tel. Co-Op. Ass'n,* 563 F.3d at 540. Such challenges require the Court to evaluate the agency's FRFA under the arbitrary and capricious standard of review. *Id.* at 540; *see also* 5 U.S.C. § 611(a)(2); *Nat'l Coal. For Marine Conservation v. Evans,*

---

[16] On September 27, 2010, after the Board issued its notice of final rulemaking and associated FRFA, Congress amended 5 U.S.C. § 604(a), Pub.L. 111-240, § 1601, 124 Stat. 2551 (Sept. 27, 2010). The amended § 604(a) now provides for additional detail in the FRFA.

231 F. Supp. 2d 119, 142 (D.D.C. 2002) ("The standard of review is the same as that under the APA, in that a court reviews the FRFA for arbitrary and capricious action.").

Plaintiffs argue that the Board failed to comply with RFA by not properly addressing the Rule's impact on small businesses. Specifically, NAMB argues that the Board failed to provide a statement of the need for or objectives of the rule; failed to meaningfully analyze the Rule's impact on small businesses; failed to respond to public comments; and failed to analyze alternatives to the proposed regulation. NAMB Mem., 28-34. The Court disagrees with each of these charges.

In its notice of final rulemaking, the Board supplied a complete and reasoned FRFA. Board Notice of Final Rule, 75 Fed. Reg. 58,530-33. The FRFA relayed that the Board is promulgating the Rule to "address problems that have been observed in the mortgage market" in order "to prohibit unfair and deceptive acts and practices in connection with mortgage loans." *Id.* at 58,531. Further, the Board recognized that the regulation would have a "significant economic impact on a substantial number of small entities," but the "precise compliance costs would be difficult to ascertain" because these costs would depend on "unknown factors" specific to each small business. *Id.* Nevertheless, the Board stated that "some small entities will be required, among other things, to alter certain business practices, develop new business models, re-train staff, and reprogram operational systems . . . ." *Id.* at 58,533.

Despite NAMB's assertion to the contrary, the FRFA discussed public comments and proposed alternatives to the regulations. *See id.* at 58,531-32. Specifically, the FRFA discussed a proposal to further increase disclosure for mortgage brokers and another regarding exemptions for creditors. *Id.* at 58,532. The Board stated why both proposals would not further the aims of the regulations, and would in fact undercut the aim of protecting consumers. *Id.* Although

NAMB argues that the Board did not specifically address proposed regulation § 226.36(d)(2), the portion of the Rule that NAMB challenges, the FRFA addressed the effects of all of the Rule's prohibitions regarding loan originator compensation collectively, and this satisfies the Board's obligations under 5 U.S.C. § 604(a).[17]

The Board supplied a FRFA with its notice of final rulemaking that met the requirements of the RFA and the SBREFA. The plaintiffs' argument that the Rule should be remanded because the Board failed to supply a proper FRFA is therefore unavailing.

The record currently before the Court indicates that the plaintiffs have not demonstrated a likelihood of success on the merits. Congress granted the Board broad authority in TILA and HOEPA, and the Board relied on TILA's Section 1639(l)(2) when it promulgated the Final Rule. Furthermore, the record before the Court indicates that the Board's actions and intent in promulgating the Rule are supported in the record and have a reasonable basis. Although the plaintiffs have not demonstrated a likelihood of success on the merits, the Court nonetheless evaluates their claims of irreparable harm.

### 3. Irreparable Harm

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006). The injury "must be both certain and great; it must be actual and not theoretical." *Id* (quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). This requires the party moving for injunctive relief to demonstrate that "[t]he injury complained of is of such *imminence* that there is a 'clear

---

[17] Section 604(a) states that an agency is required to prepare a FRFA for the agency's "final rule," and Section 604(a)'s subsections refer to the agency's obligation to evaluate "the rule," § 604(a)(1), (a)(4), (a)(5); "the proposed rule," § 604(a)(2)-(3); and "the final rule," § 604(a)(6). The text of the statute does not support the contention that the Board was required to analyze each proposed subpart of the regulation individually.

and present' need for equitable relief to prevent irreparable harm." *Id.* (citations omitted). In addition, "the injury must be beyond remediation." *Id.*

Under this Circuit's irreparable harm standard, "harm that is 'merely economic' in character is not sufficiently grave." *Coal. For Common Sense In Gov't Procurement v. United States,* 576 F. Supp. 2d. 162, 168 (D.D.C. 2008); *see also Wisconsin Gas,* 758 F.2d at 674. For potential economic loss to constitute a showing of irreparable harm, "a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence." *Coal. For Common Sense In Gov't Procurement,* 576 F. Supp. 2d. at 168 (quoting *Gulf Oil Corp. v. Dep't of Energy,* 514 F.Supp. 1019, 1025 (D.D.C.1981)); *see also Wisconsin Gas,* 758 F.2d at 674. "Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wisconsin Gas*, 758 F.2d at 674.

Economic harm may qualify as irreparable, however, "where a plaintiff's alleged damages are unrecoverable." *Sterling Commercial Credit - Michigan, LLC v. Phoenix Indus. I, LLC,* No. 10-cv-2332, 2011 WL 263674, at *7 (D.D.C. Jan. 28, 2011) (quoting *Clarke v. Office of Fed. Hous. Enter.,* 355 F. Supp. 2d 56, 65 (D.D.C.2004)); *see Bracco Diagnostics, Inc. v. Shalala,* 963 F. Supp. 20, 29 (D.D.C.1997). The "mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Nat'l Mining Ass'n v. Jackson,* No. 10-cv-1220, 2011 U.S. Dist. LEXIS 3710, at *46 (D.D.C. Jan. 14, 2011). Rather, the ability of a plaintiff to recover economic losses is "but one factor the court must consider" and these losses must nonetheless be certain and imminent. *Id.*

Plaintiffs NAMB and NAIHP both contend that without a preliminary injunction, the Rule will cause their members irreparable harm. However, they proffer different grounds to establish a showing of irreparable harm. The Court addresses each individually.

### a. NAIHP's Showing of Irreparable Harm

NAIHP argues that its members will be irreparably harmed without an injunction in two respects: First, NAIHP contends that the Board's Rule conflicts with Department of Housing and Urban Development ("HUD") regulations prescribed under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq*, which requires loan originators to pay a consumer in the event that the terms of a consumer's loan exceeds certain defined tolerances. NAIHP argues that due to the alleged conflict between the two regulations, the Board's rule "places the loan originator in a position of having to choose which rule to violate" and "places every mortgage broker and originator in jeopardy." Savitt Aff., ¶¶ 16-17. NAIHP's second contention is that the Board failed to properly consider the Rule's effect on small businesses, which the Board itself acknowledges could have "a significant economic impact on a substantial number of small entities." Board Notice of Final Rule, 75 Fed. Reg. 58,531. NAIHP's affiant indicates that he will face unrecoverable costs complying with the Board's regulation, due to its complexity and lack of Board guidance, as well as unrecoverable loss in revenue for his business.

Both grounds NAIHP relies upon to demonstrate irreparable injury are insufficient to establish a need for extraordinary injunctive relief. While harmonization of requirements under RESPA and the Board's Rule may be a challenge, the asserted injury is speculative. In its brief and during oral argument, the Board denied that there is any conflict between RESPA and the Rule. Defs.' Opp. Pls.' Mot. Prelim. Inj., at 18-19. NAIHP's affiant does not assert that due to

the conflict in the Rules he will certainly sustain irreparable harm, but rather that "with no clear instructions from the Board, small entities will *surely* sustain unaffordable and needless legal expenses." Savitt Aff., ¶ 17 (emphasis added). This alleged injury, which may not even occur if the Board or HUD decides to provide additional guidance, is speculative and does not rise to the level of injury that constitutes irreparable harm in this Circuit.

Similarly, NAIHP's argument that small businesses will be adversely affected, while compelling, is not properly supported. NAIHP provides one affidavit to describe the Rule's affect on small businesses and this affiant does not inform the Court that his business will be irreparably destroyed by the Board's rule, but rather that "[a]s a small business owner, [he is] concerned that the lack of clarity on such a difficult rule to understand and made worse by various interpretations from wholesale lenders, will create an environment of noncompliance." *Id.* at ¶ 13. Affiant does state that the Rule will "destroy various business relationships [he] has developed over the years," *id.* at ¶ 20, but, again, he does not inform the Court that the Rule threatens the very existence of his business. *See Wisconsin Gas*, 758 F.2d at 674 ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur."). Rather, NAIHP argues that its members face irreparable harm because they face "unrecoverable and massive costs associated with attempting to comply [with the Rule.]." NAIHP Mem., at 22. Other than conclusory allegations, however, the plaintiff has failed to support this contention. NAIHP's affiant states that because of the Rule, he will be unable to offer discounts through the "Community Heroes Program," which will "destroy various business relationships," Savitt Aff., ¶ 20, and will not be able to participate in the "West Virginia Housing Development Fund," which will represents a "substantial amount of [his] business." *Id.* at ¶¶ 21-22. He does not provide specific details regarding the extent to which his

business will suffer or even assert that this unrecoverable monetary harm will be severe. *See Sterling Commercial Credit*, 2011 WL 263674 at *7 ("plaintiff has provided no information as to what effect the purported economic harm will have on its business. Thus, plaintiff has provided no reason for this Court to depart from the established rule "that economic harm does not constitute irreparable injury."). Although NAIHP's affiant states that NAIHP members face the "very real prospect of business being destroyed for lack of clarity" in the Rule, Savitt Aff., ¶ 26, "'[b]are allegations of what is likely to occur,' couched . . . in mere possibilities [] 'are of no value since the court must decide whether the harm will *in fact* occur.'" *Sterling Commercial Credit*, 2011 WL 263674 at *7 (quoting *Wisconsin Gas,* 758 F.2d at 674).

Unrecoverable economic harm may constitute irreparable injury, but plaintiff has failed to adequately describe and quantify the level of harm its members face. The Court must therefore rule that the NAIHP has failed to demonstrate that its members will be irreparably harmed by the Board's implementation of the Rule.

### b. NAMB's Showing of Irreparable Harm

In support of its motion for injunctive relief, NAMB argues that § 226.36(d)(2) effectively precludes mortgage brokerages from paying their loan originators on a commission-basis, a compensation model used in the industry for decades and the "standard method of compensat[ion]" for independent mortgage brokers.  NAMB Mot. Prelim. Inj., ECF No. 4, Michael Anderson Aff. (hereinafter "Anderson Aff."), ¶ ¶19(i)-20; D'Alonzo Aff., ¶ 19.  This prohibition, even before the Rule becomes effective on April 1, 2011, has "resulted in loan officers resigning from their positions and leaving for competitors, and will result in individual loan officers being terminated, mortgage brokers closing their doors and ceasing operations, wholesale lender operations being significantly diminished and less loan choices for consumers."

NAMB Mem., at 9.  Specifically, NAMB argues that the Rule requires mortgage brokers to abandon compensation models that are tied to the terms of loan agreements, and small brokerages are "unable to compensate [their] loan officers in other manner [sic], such as salary or bonus rate" due to limitations on resources and capital.  Anderson Aff., ¶ 28.; D'Alonzo Aff., ¶¶ 20-21, 23 ("impossible for mortgage brokerages to provide a competitive, fixed salary-based compensation structure for their loan officers" and "the mortgage brokerage industry simply cannot adapt to this restriction on its compensation practices"); NAMB Mot. Prelim. Inj., ECF No. 4, Carlos Gutierrez Aff. (hereinafter "Gutierrez Aff."), ¶18 (stating that other forms of compensation "not feasible" and "unworkable" in company's business model).   Unlike these brokerages, however, creditors are not subject to the Board's Rule and are therefore free to pay their employees on a commission basis.  "As a direct result . . . loan officers have already begun to resign their positions and leave for 'creditors' (lenders and banks), who are not prohibited from paying these loan officers commissions." NAMB Mem., at 10; Anderson Aff., ¶ 30 ("Our loan officers are already being solicited by banks who are telling them that all mortgage brokerages will be out of business after April 1, 2011 because they have no economically viable business model to turn to in order to stay in business.").  One of NAMB's affiants describes "at the end of the day [my brokerage firm] and other mortgage brokerage firms will not be able to retain any loan officers.  This will leave these businesses to become one-man shops, which is neither feasible nor practical since companies [like mine] cannot support the required overheard and operational expense as a one-man operation.  Thus, the only alternative for [my brokerage] and thousands of small business mortgage brokerages like it is to close their doors." Anderson Aff., ¶ 33.

To further support the contention that implementation of § 226.36(d)(2) will cause many mortgage brokers to lose their jobs or close their business, NAMB presents attestations from five small business owners who state that that the prohibition on commission-based compensation has caused them to "come to a single sobering conclusion, that I have no choice but to lay off all of my originators and attempt to originate loans solely." Gutierrez Aff., at ¶19; NAMB Mot. Prelim. Inj., ECF No. 4, Affs. of Belinda M. Janecke, at ¶ 20, Residential Mortgage of South Carolina, LLC, at ¶ 21; *see also* NAMB Mot. Prelim. Inj., ECF No. 4, Walter Financial, LCC Aff., at ¶ 24 ("After reviewing the type of compensation packages that would be necessary to retain my loan originators so that Walter Financial can generate loans, it is clear to me that shortly after April 1, 2011 Walter Financial will either lose its loan officers, or will have to terminate them."); NAMB Mot. Prelim. Inj., ECF No. 4, Terry L. Clark Aff., at ¶ 13 ("result in a mass exodus or termination of licensed, professional loan officers and will result in the loss of thousands of additional jobs for the employees that support the mortgage loan process (i.e. Loan Processors, Underwrites, Loan Closers, etc.)").

NAMB has sufficiently demonstrated that its members will likely be irreparably harmed by the implementation of the Board's Rule prohibiting dual compensation for loan originators who are paid directly by a consumer. Although NAMB members face purely economic injury, they sufficiently assert that this injury will "result in the complete destruction of their business," which certainly constitutes irreparable harm. *Cf. United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 988, 991 (D.D.C. 2006) ("For example, Defendants do not contend that compliance with the Order will result in the complete destruction of their business, which is the legal standard applied by our Court of Appeals in determining whether economic loss constitutes irreparable harm," citing *Wis. Gas Co.*, 758 F.2d at 673-74). NAMB has therefore shown that its

members would face an irreparable harm absent an injunction enjoining the Board from implementing § 226.36(d)(2).

### 4. Balance of Equities and the Public Interest

The Board has admitted in the Rule's supplementary comments that small independent brokerages and loan originators across the country will be substantially affected by the Rule and its prohibitions on certain compensation practices. *See* Board Notice of Final Rule, 75 Fed. Reg. 58,531. Plaintiff NAMB has demonstrated that its members face irreparable harm absent an injunction enjoining the Final Rule. The Board counters that if the Court grants an injunction, the Court will "thwart TILA's purpose of protecting customers" and will "substantially harm consumers nationwide by subjecting unsuspecting consumers to the existing practice of paying loan originators compensation that is tied to the terms and conditions of the loans being marketed to those consumers." Defs.' Opposition to Pls.' Mot. Prelim. Inj., at 41. Although NAMB's demonstration that its members face substantial irreparable harm is compelling, the Court must consider the plaintiff's harm against both the public interest furthered through the Rule, and the fact that the plaintiffs have not demonstrated a likelihood of success on the merits. That said, the Board has reasonably concluded that the Rule will further public policy interests, a position that is further supported by the Dodd-Frank Act which also includes provisions restricting certain loan-compensation practices. *See* Dodd-Frank Act, § 1403, 124 Stat. 2139-40 (prohibitions on steering incentives for mortgage originators). Based upon the record, despite the harm plaintiffs' members may face, the Court must deny the plaintiffs' motions for injunctive relief.

## III. CONCLUSION

For the foregoing reasons, the plaintiffs NAIHP and NAMB's motions for temporary restraining orders and preliminary injunctions are DENIED. An Order consistent with this Memorandum Opinion will be entered.

**SO ORDERED**.

DATED: March 30, 2011                                    /s/ *Beryl A. Howell*
                                                         BERYL A. HOWELL
                                                         United States District Judge